Approved: *Daniel Nessim*
Daniel G. Nessim / Kyle A. Wirshba
Assistant United States Attorneys

Before: HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

ITIEL PALACIOS GARCIA,
a/k/a "El Playa,"
a/k/a "El Compa Playa,"

Defendant.

- - - - - - - - - - - - - - - - - - x

20 MAG 4556

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 924, 3238, 2
21 U.S.C. § 963;

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRENT WOOD, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

COUNT ONE
(Cocaine Importation Conspiracy)

1. From at least in or about 2015 up to and including in or about April 2020, in Mexico and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, would and did import into the United States and into the customs territory of the United

States from a place outside thereof controlled substances, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3. It was further a part and an object of the conspiracy that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4. It was further a part and an object of the conspiracy that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

5. The controlled substance that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

COUNT TWO
(Possession of Machineguns and Destructive Devices)

6. From at least in or about 2015 up to and including in or about 2018, in Mexico and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States and for which one of two or more

joint offenders has been first brought to and arrested in the Southern District of New York, ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

## COUNT THREE
(Conspiracy to Possess Machineguns and Destructive Devices)

7.  From at least in or about 2015 up to and including in or about 2018, in Mexico and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

8.  It was a part and object of the conspiracy that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, would and did use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9. I am a Special Agent with the DEA and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, and my conversations with law enforcement officers and employees, as well as my review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

10. Based on my review of documents and my conversations with a cooperating witness ("CW-1")[1] and other law enforcement officers, I have learned the following, in substance and in part:

    a. CW-1 is a citizen and native of Mexico and, for many years, was involved in trafficking multi-kilogram quantity loads of narcotics to the United States.

    b. In or about 2012, CW-1 met ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, in Puebla, Mexico. At the time CW-1 met PALACIOS GARCIA, CW-1 understood that PALACIOS GARCIA was involved in drug trafficking. During this meeting and at subsequent meetings, PALACIOS GARCIA was accompanied by a security detail including heavily armed bodyguards.

    c. In approximately 2015, CW-1 met with PALACIOS GARCIA and, among others, three other Mexican drug traffickers ("CC-1," "CC-2," and "CC-3") at a restaurant in Cancun, Mexico. During the meeting, PALACIOS GARCIA discussed the drug trafficking in which PALACIOS GARCIA and CC-2 were engaged, including

---

[1] CW-1 has pleaded guilty, pursuant to a cooperation agreement, to federal drug-trafficking and money-laundering offenses. CW-1 has been cooperating with the DEA since in or about 2018 in the hope of obtaining leniency in sentencing. In 2019, CW-1 was sentenced to more than thirteen years' incarceration and continues to cooperate in the hope of receiving a sentence reduction. Information provided by CW-1 has been corroborated in part by, among other things, other documents and records and statements made by other witnesses.

trafficking of both heroin and cocaine from Mexico to Chicago, Illinois and Atlanta, Georgia. PALACIOS GARCIA invited CW-1 to work with PALACIOS GARCIA to traffic drugs. CW-1 and PALACIOS GARCIA agreed to continue the conversation the following day during a yacht ride. Also during this meeting, CC-1 told CW-1 that CC-1 had recently traveled to Papanoa, Guerrero, Mexico, to receive an approximately 600 kilogram shipment of cocaine on PALACIOS GARCIA's behalf.

    d.  The following day, PALACIOS GARCIA was not feeling well and did not join the rest of the group on the planned yacht ride. On the yacht, CC-1 and CC-3 discussed their plans to purchase a plane ("Plane-1") to transport a load of drugs from Colombia to Venezuela (the "Plane Load"). CC-1 and CC-3 told CW-1 that the partners in the Plane Load would be PALACIOS GARCIA, CW-1, CC-1, CC-2, CC-3, and another individual ("CC-4"). Once in Venezuela, Plane-1 would then fly to Guatemala, where the Plane Load would be transported by land to Mexico and then ultimately to the United States.

    e.  Approximately three weeks after the conversation in the Cancun restaurant, CW-1 meet with CC-1 in Mexico City. CC-1 explained that it would cost approximately one million dollars to purchase and operate Plane-1, and asked CW-1 to invest $300,000 toward the purchase. CW-1 agreed to invest $250,000, and understood that he would share the costs of purchasing and operating Plane-1 with CC-2, CC-3, and CC-4. Approximately one week later, CC-1 picked up $250,000 in cash from CW-1. CC-1 later told CW-1 that Plane-1 had been purchased and that negotiations were underway for the funding and purchase of the Plane Load.

    f.  In or about July 2015, CW-1 was arrested by Mexican law enforcement. As a result of his arrest, CW-1 was unable to invest in the Plane Load, the negotiations for which had not yet been finalized at the time of CW-1's arrest.

    g.  Approximately one year after CW-1's arrest, while he was in Mexican custody, CC-1 visited CW-1 in jail in Mexico. CC-1 told CW-1 that the Plane Load, which consisted of approximately 800 kilograms of cocaine, had been successfully transported. CC-1 later transferred approximately $300,000 to CW-1 to pay CW-1 back for his investment in purchasing Plane-1.

    h.  In or about late 2017 or early 2018, CC-1 and CC-4 visited CW-1 while CW-1 was incarcerated in jail in Mexico. CC-1 and CC-4 smuggled into the jail a cellphone (the "Phone"), which was purportedly engineered to allow for untraceable

conversations. CC-1 and CC-4 told CW-1 that PALACIOS GARCIA had provided the Phone to them to give to CW-1, and explained that PALACIOS GARCIA wished to communicate with CW-1 concerning a problem PALACIOS GARCIA was facing.

   i.   During CC-1's and CC-4's visit to CW-1 in the Mexican jail, CC-1 and CC-4 also described PALACIOS GARCIA's longstanding conflict with the Los Zetas drug cartel in Mexico (the "Zetas"). CC-1 and CC-4 explained, in substance and in part, that the Zetas had murdered PALACIOS GARCIA's father. As a result, PALACIOS GARCIA was attempting to kill as many Zetas members as he could in the Mexican state of Veracruz, where both the Zetas and PALACIOS GARCIA exercised zones of control. CC-1 and CC-4 told CW-1 that CC-1 and CC-4 were obtaining firearms including AK-47s and AR-15s, as well as hand grenades, for PALACIOS GARCIA's use against the Zetas. CC-1 and CC-4 also asked CW-1 if CW-1 knew of additional sources from whom they could acquire more weapons for PALACIOS GARCIA.

   j.   Following CC-1 and CC-4's visit, CW-1, while still incarcerated in Mexico, communicated with PALACIOS GARCIA over the Phone. PALACIOS GARCIA informed CW-1, in substance and in part, the following:

      i.   PALACIOS GARCIA had a base of operation in several small towns along Mexico's Pacific coast in the state of Guerrero, including, as discussed above, Papanoa.

      ii.  Two drug traffickers ("DT-1" and "DT-2") had operated in the vicinity of a small town near PALACIOS GARCIA's zone of operations ("Town-1"). DT-1 and DT-2 entered into violent conflict, which resulted in DT-1 ejecting DT-2 from Town-1. DT-2 took refuge in PALACIOS GARCIA's territory and began working with PALACIOS GARCIA. DT-2 engaged in an attempted murder plot against DT-1 in retribution. As a result of this failed attempt, DT-1 threatened PALACIOS GARCIA that anyone working for PALACIOS GARCIA who attempted to move through DT-1's territory would be killed.

      iii. DT-1's threat disrupted PALACIOS GARCIA's drug transportation route along the Pacific coast of the state of Guerrero to Mexico City.

      iv.  PALACIOS GARCIA understood that CW-1 was from Town-1 and close friends with DT-1. PALACIOS GARCIA had therefore sent CC-1 and CC-4 to the Mexican jail to provide CW-1 with the Phone in the hope that CW-1 could broker a truce between PALACIOS GARCIA and DT-1.

k. CW-1 communicated with DT-1 in an effort to mediate the dispute. DT-1 told CW-1, in substance and in part, that if PALACIOS GARCIA wanted to end the dispute, PALACIOS GARCIA would need to send a personal representative to meet with DT-1. CW-1 relayed this message to CC-1 so that CC-1 could convey it to PALACIOS GARCIA.

11. Based on my conversations with other law enforcement officers and a law enforcement confidential source ("CS-1"),[2] I have learned, among other things, that in or about March 2020, CS-1 received two photographs from an associate in Mexico ("Associate-1").[3] Each of the photographs depicted what appeared to be one kilogram of cocaine with distinct brands embossed into the kilograms. One of the kilogram's stamps read "AK-47," and the other kilogram's stamp read "Chopar." CS-1 informed law enforcement, in substance and in part, that Associate-1 told CS-1 that the kilograms belonged to ITIEL PALACIOS GARCIA, a/k/a "El Playa, a/k/a "El Compa Playa," the defendant, and were for sale.

12. Based on my conversations with other law enforcement officers and review of documents and records, I have learned, among other things, the following:

a. A law enforcement confidential source ("CS-2")[4] told law enforcement, in substance and in part, that CS-2 had

---

[2] CS-1 is a paid law enforcement source and has served in that capacity since in or about 2002. In addition to payment, CS-1 also provides information to law enforcement in order to obtain immigration benefits. CS-1 was previously convicted of narcotics offenses. Information provided by CS-1 has proven reliable and has been corroborated by, among other things, narcotics seizures and events independently observed by law enforcement.

[3] Associate-1 provides information to CS-1 with the understanding that CS-1 will convey that information to law enforcement. Associate-1 previously served as a paid law enforcement source, but was deactivated when his case agent handler was transferred to a different service station. Associate-1 has no criminal history. Information provided by Associate-1 has proven reliable and has been corroborated by, among other things, documents and records and statements made by other witnesses.

[4] CS-2 has served as a law enforcement source since in or about 2019. CS-2 is providing information to law enforcement in the hope of receiving leniency in charging decisions for CS-2 and also

7

learned that ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, was a partial investor in a drug load, transported by plane, that was lost on or about April 20, 2020, in Guatemala.

    b. Associate-1 informed CS-1, in substance and in part, that Associate-1 had learned that PALACIOS GARCIA was a partial investor in a load of drugs that was transported by plane. This drug load was lost in a plane accident in or about mid- to late-April that resulted in the death of both pilots on board.

    c. Law enforcement identified two seizures of narcotics transported by airplane during the relevant time period. Only one of these seizures involved a plane crash: On or about April 19, 2020, a small jet ("Plane-2") crashed in the vicinity of Sayaxche in the Peten region of Guatemala. Plane-2's two pilots died on impact. Guatemalan law enforcement responding to the scene of the Plane-2 crash recovered approximately 761 kilograms of a substance that, based on field tests conducted by Guatemalan law enforcement, law enforcement believes to be cocaine.

    d. Based on the information provided by CS-2 and Associate-1, the information regarding the Plane-2 crash, and my training and experience and involvement in this investigation, I believe that when Plane-2 crashed, it was transporting a load of cocaine belonging to PALACIOS GARCIA and others.

    e. Based on information obtained from the Federal Aviation Administration ("FAA"), I have learned that, at the time Plane-2 crashed in Guatemala, Plane-2 was registered as a United States aircraft with the FAA.

---

in the hope of obtaining leniency in sentencing for CS-2's family member who is facing narcotics charges. CS-2 has no criminal history. Information provided by CC-2 has proven reliable and has been corroborated by, among other things, documents and records and statements made by other witnesses.

      WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ITIEL PALACIOS GARCIA, a/k/a "El Playa," a/k/a "El Compa Playa," the defendant, and that he be imprisoned or bailed, as the case may be.

S/ by the Court with consent
_____
BRENT WOOD
Special Agent
Drug Enforcement Administration

Sworn to before me this
1st day of May, 2020

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK